# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| CRAIG MANFIELD and<br>JANICE HENDRICKS,<br><br>      Plaintiffs,<br>v.<br><br>ALUTIIQ INTERNATIONAL<br>SOLUTIONS, INC., ALUTIIQ, LLC,<br>And AFOGNAK NATIVE CORP.,<br><br>      Defendants. | Docket no. 2:11-cv-00287-NT |

## OPINION AND ORDER
## ON PARTIAL MOTION TO DISMISS

This case comes before the Court on the Defendants' Motion to Dismiss Counts I and II of the First Amended Complaint (the "**Complaint**")[1] pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state claims for which relief may be granted. For the reasons discussed below, the Defendants' motion to dismiss Count I is DENIED, and the Defendants' motion to dismiss Count II is GRANTED as to Plaintiff Manfield but DENIED as to Plaintiff Hendricks.

## LEGAL STANDARD

Rule 8 of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is

---

[1] Together, the Plaintiffs make five claims against the Defendants. Count I is a retaliation claim brought by Manfield pursuant to the False Claims Act, 31 U.S.C. §§ 3729 – 3733 (2010)). Under Count II, both Plaintiffs bring retaliation/discrimination claims against the Defendants pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 201 – 219 (2011). Count III also states claims by both Plaintiffs for violations of the Maine Human Rights Act, 5 M.R.S. §§ 4551 – 4555 and the Maine Whistleblowers' Protection Act, 26 M.R.S. §§ 831 – 841, alleging that Defendants discriminated against them for engaging in protected conduct. Counts IV and V are brought by Hendricks under the Maine Human Rights Act and 42 U.S.C. §§ 2000e – 2000e-17 ("**Title VII**") for discrimination and retaliation within the meaning of these acts.

entitled to relief" and that "each allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(a)(2) and 8(d)(1). The First Circuit has set forth, consistent with *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), the "proper way of handling a motion to dismiss" under Rule 12(b)(6):

> Step one: isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements. Step two: take the complaint's well-pled (*i.e.* non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief.

*Schatz v. Republican State Leadership Committee*, No. 11-1437, 2012 WL 414264, at *4 (1st Cir. Feb. 10, 2012) (citations omitted). "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job that requires the reviewing court to 'draw on' its 'judicial experience and common sense.'" *Id.* (quoting *Iqbal*, 129 S. Ct. at 1950.)

## FACTUAL BACKGROUND

The Plaintiffs allege the following facts. Plaintiff Craig Manfield ("**Manfield**") was employed as a site supervisor by EPS Corporation, a contractor responsible for security at the Portsmouth Naval Shipyard ("**PNSY**"). In May of 2009, the Defendants Alutiiq International Solutions, Inc., Alutiiq, LLC, and Afognak Native Corp. (the "**Defendants**") began making preparations to take over the security contract for the PNSY effective July 1, 2009. The Defendants asked Manfield to stay on as site supervisor, and he began working for the Defendants on June 5, 2009. The Defendants hired many of the EPS security officers. Manfield,

tasked with ensuring a smooth transition, was responsible for issuing uniforms, coordinating training and administering pre-employment medical, psychological, and physical readiness tests.

Manfield began having difficulties with the Defendants on June 16, 2009, when Defendants shipped a package to Manfield's office containing fifty rounds of 12-gauge shotgun ammunition. The Defendants did not yet have a memorandum of understanding ("**MOU**") in place with the Navy which would legally allow Manfield to accept this shipment of ammunition at PNSY. Manfield informed Michael Bucher, the Defendants' project manager assigned to oversee the Defendant's contract with PNSY, that no ammunition could be accepted until an MOU was executed. Although Manfield eventually found a legal place to store the ammunition temporarily, Bucher was upset that Manfield was "not willing or able to help us out." Complaint at ¶ 52.

The Defendants sent yet another shipment prior to execution of the MOU, this time containing handguns, which Manfield also refused to accept on June 23, 2009. That same day, after Manfield rejected the shipment, the Defendants' Regional Program Coordinator Larry Symons instructed Manfield to accept the delivery of a computer. Manfield investigated and discovered that the "computer" had the same tracking number as the gun shipment. Manfield sent an email to Symons and Bucher, informing them that the "computer" shipment contained guns. Neither Symons nor Bucher responded to Manfield's email. On June 25, 2009, Bucher sent a draft MOU to the Navy. The MOU was approved on June 29, 2009.

On June 30, 2009, Symons brought 350 rounds of frangible ammunition to PNSY for the security officers. The Defendants' contract with the Navy required the Defendants to provide ball ammunition. Ball ammunition is more lethal than frangible ammunition, which is used for training. Manfield told Symons that frangible ammunition was not permitted, and Symons acknowledged that the frangible ammunition violated the contract. The next day, July 1, 2009, Symons informed Manfield that Symons would send, by July 2, 2009, 450 rounds of ball ammunition to replace the frangible ammunition.

On July 9, 2009, Bucher visited the PNSY. Manfield asked Bucher if there were any hard feelings over the guns and ammunition. Bucher immediately became tense and told Manfield that because of Manfield's actions the Defendants were within one day of not honoring the contract with the Navy.

Manfield also reported issues with the gun holsters and gun belts that Defendants issued to officers at PNSY. The holsters, which were single retention, were not in compliance with the Defendants' contract, which called for double retention holsters. The problem with the gun belts involved Velcro that would come unfastened causing the gun belt and gun to fall to the floor. Weeks went by before the Defendants took action to correct the holsters and belts.[2]

In early July of 2009, security officers were not paid for all of the time that they worked. Manfield spoke twice about this to Rachel Downs in the Defendants' Human Resources (**HR**) Department. On the first occasion, he told Downs about

---

[2] The Complaint does not specify to whom these reports were made or fix in time the allegations involving the holsters or the gun belts, but the complaints must have been made between June 5, 2009 and July 28, 2009, which was the period Manfield worked for the Defendants.

the discrepancies between the hours worked and hours paid. On the second occasion, he asked Downs when the officers' pay discrepancies would be corrected. Downs said that she would take care of the matter and told Manfield to tell any employee who had a problem to contact her.

Manfield advised the aggrieved security officers to contact Downs directly regarding discrepancies in their paychecks, and some of them did. Afterward, Bucher told Manfield that employees should go through Manfield with any complaints and not contact Downs directly. Downs informed Manfield on July 23, 2009 that the paychecks would go uncorrected for yet another pay period. Manfield believed some of the employees filed complaints with the Department of Labor.

On July 28, 2009, Symons met with Manfield and terminated his employment. Symons told Manfield that the company did not trust Manfield's decision to refuse the pre-MOU shipments of weapons and ammunition and that they did not trust Manfield because he had instructed employees to call HR directly regarding their payroll issues. The Defendants later claimed that they fired Manfield because he was "defiant and uncooperative."

Plaintiff Janice Hendricks ("**Hendricks**") also became employed by the Defendants when they took over the security contract for PNSY. At all times during her employment, Hendricks's rank was Lieutenant. Hendricks is a gay woman. Hendricks was one of the employees who did not receive full pay in July. On July 9, 2009, Hendricks told Downs that the failure to pay the wages was illegal, specifically citing the Fair Labor Standards Act. On July 10, 2009, the day after

5

Hendricks spoke to Downs about the illegal deductions from her paycheck, Bucher told Manfield that Hendricks could not fill in for Manfield as site supervisor while Manfield was on vacation.[3] After Manfield was fired, Hendricks expressed interest in Manfield's position, but she was not considered. Instead the Defendants hired a straight male for the position. Hendricks claims that she was not considered for or hired for the site supervisor position because of her sex, sexual orientation, and/or because she complained about illegal deductions from her paycheck.

## DISCUSSION

### I. Count I: False Claims Act Claim (31 U.S.C. § 3730(h))

Under the False Claims Act (the "**FCA**"), an employee may bring a claim against an employer if that employer takes adverse employment action against the employee because of the employee's efforts to prevent the employer from engaging in fraud on the federal government. *See* 31 U.S.C. § 3730(h). To prevail on an FCA retaliation claim, a plaintiff must show that: 1) the employee's conduct was protected under the FCA; 2) the employer knew that the employee was engaged in such conduct; and 3) the employer discharged or discriminated against the employee because of his or her protected conduct. *Harrington v. Aggregate Industries-Northeast Region, Inc.*, 2012 WL 372708, *4 (1st Cir. Feb. 7, 2012); *U.S. ex rel. Karvelas v. Melrose–Wakefield Hosp.,* 360 F.3d 220, 240 (1st Cir. 2004), *abrogated on other grounds by Allison Engine Co., Inc. v. U.S. ex rel. Sanders,* 553 U.S. 662, 128 S.Ct. 2123, 170 L.Ed.2d 1030 (2008), *superseded by statute*, Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, 123 Stat. 1617, *as*

---

[3] Manfield took a week-long vacation beginning July 13, 2009.

6

recognized in *U.S. ex rel. Laughlin v. UNUM Group*, 613 F.3d 300, n. 7 (1st Cir. 2010).

The Defendants claim that the Plaintiff has failed to state a cause of action because his conduct was not protected under the FCA. The Plaintiff responds that his complaints to his supervisors that the frangible ammunition and the single retention holsters were unacceptable under the Navy's contract constituted protected activity under the FCA. The Plaintiff further responds that the Defendants knew that he was engaged in protected conduct and that he was discharged, at least in part, because of his complaints.

**A. Protected Conduct Under the FCA**

**1. Applicable Version of the Statute**

Both parties cite to a version of Section 3730(h) that was revised prior to the acts complained of in this case.[4] This older version of the FCA retaliation provision protected only those claimants who engaged in conduct that reasonably could lead to a viable FCA action.[5] *Karvelas*, 360 F.3d at 236.

---

[4] The version of Section 3730(h) in effect prior to the May 20, 2009 amendments provided: "Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole." 31 U.S.C. § 3730(h)(2008).

[5] 31 U.S.C. § 3730(b)-(d) allows individuals to bring an action on behalf of the government to recover losses the government sustained due to fraud and gives such individuals a share of any recovery obtained for the government.

7

On May 20, 2009, Congress enacted the Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, 123 Stat. 1617 (2009) ("**FERA**"). Among other things, FERA amended Section 3730(h) of the FCA to read:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of other efforts to stop 1 or more violations of this subchapter. [6]

In enacting FERA, Congress intended to strengthen the tools available to combat fraud against the Government. The Senate Report accompanying FERA stated:

> One of the most successful tools for combating waste and abuse in Government spending has been the False Claims Act (FCA), which is an extraordinary civil enforcement tool used to recover funds lost to fraud and abuse. The effectiveness of the FCA has recently been undermined by court decisions limiting the scope of the law and allowing subcontractors and non-governmental entities to escape responsibility for proven frauds. In order to respond to these decisions, certain provisions of the FCA must be corrected and clarified in order to protect the Federal assistance and relief funds expended in response to our current economic crisis.

S. Rep. 111-10, at Part III, sec. 4 (2009). Although the Senate Report does not specifically discuss the amendments to the retaliation claim section, it is clear that Congress was not seeking to narrow the scope of the FCA.[7]

---

[6] This provision was effective May 20, 2009. The actions alleged in the complaint occurred between May 28, 2009 and July 28, 2009, making this version of the statute applicable. Effective July 22, 2010, Congress again amended 31 U.S.C. § 3730(h) to clarify that a plaintiff may state a claim for retaliation not only when he has acted "in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." Pub. L. 111-203, 124 Stat 1376 § 1079A(c)(1) (2010).

[7] Although the legislative history to Pub. L. 111-203, 124 Stat 1376 § 1079A(c)(1) (2010) does not shed any light on the 2010 amendment, it would appear from the unusual construction of the 2009 amendment, particularly its inexplicable use of the word "other" to modify "efforts," that Congress

At oral argument, both parties cited *U.S. ex rel Nowak v. Medtronic, Inc.*, 806 F. Supp. 2d 310, 339 (D. Mass. 2011), for the proposition that the FERA amendments to Section 3730(h) did not make much difference since the First Circuit's definition of protected activity has been objective and broad since *Karvelas* was decided in 2004. Indeed, in *Nowak*, Judge Woodlock stated that the 3730(h) standards laid out by the First Circuit in *Karvelas* are "essentially the same" in a post-FERA world. *Nowak*, 806 F. Supp. 2d at 340. *See also Gobble v. Forest Laboratories, Inc.*, 729 F. Supp. 2d 446, 450 (D. Mass. 2010).[8]

Post-FERA, lawful acts done "in furtherance of other efforts to stop" a violation of the FCA are protected conduct. Just as an employee's internal complaints which relate to an FCA violation would be considered "conduct that reasonably could lead to a viable FCA action" under *Karvelas,* 360 F.3d at 256, they would also naturally fall within the ambit of an "effort to stop" a violation under the amended section 3730(h). The question becomes whether Manfield's complaints of equipment deficiencies under the contract are sufficiently related to an FCA violation to constitute protected conduct.

### 2. Relation to an Underlying FCA Violation

Not every violation committed by an employer constitutes an FCA violation. In *Karvelas*, 360 F.3d at 237-39, the plaintiff complained to his employer about

---

inadvertently left out the phrase "in furtherance of an action under this section" before "or other efforts to stop 1 or more violations of this subchapter" in the 2009 amendment.

[8] Two district courts that have reviewed the change in language have found that FERA broadens the scope of protected conduct. *See Halasa v. ITT Educ. Servs., Inc.*, 2011 WL 4036516, No. 10-cv-437-WTL-MJD, *4 (S.D. Ind. Sept. 12, 2011), *Bell v. Dean*, 2010 WL 2976752, No. 09-cv-1082-WKW, *1-2 (M.D. Ala. July 27, 2010).

9

violations of regulatory and patient care standards and of illegal billing to Medicare and Medicaid. The reports of violations of regulatory and patient care standards were not protected conduct under the FCA because they were not related to FCA violations. Similarly, neither Manfield's reporting on his officers' overtime complaints nor his complaints relating to unlawful shipments of guns and ammunition were related to FCA violations, and they are therefore not considered protected conduct. However, Manfield's reports regarding the inadequacy of equipment under the Navy contract may concern FCA violations.

Although an employee's reports must be related to an FCA violation to constitute protected conduct, a retaliation claim "does not require a showing of fraud and therefore need not meet the heightened pleading requirements of Rule 9(b). *Karvelas*, 360 F.3d at 238, n. 23. Rather, to state a claim for retaliation the Plaintiff need only allege circumstances that support a potential fraud. *Id.* at 236 (In a retaliation claim, the plaintiff is not required "to have filed an FCA lawsuit or to have developed a winning claim at the time of the alleged retaliation.")

The Defendants, citing *Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 377 (4th Cir. 2008), argue that the equipment deficiencies were a mere breach of contract and as such they cannot form the basis of an FCA claim. However, the Defendants' reliance on *Wilson* is misplaced. *Wilson* did not distinguish between the standard for pleading an FCA violation itself and the standard for pleading a claim for retaliation under the FCA. Pleading an actual FCA violation requires pleading

fraud with particularity, and a mere allegation of a breach of contract does not suffice to state a claim for fraud.

The Defendants also assert that the Complaint is fatally defective because it does not specify how the inadequacy in the gear provided by the Defendants is related to the presentation of a false or fraudulent claim for payment. It is true that Manfield's complaints did not involve any direct observations of forged or falsified billing to the federal government, and there is no question that the inference of fraud is clearer where falsified documents are submitted to the government in support of payment for services. *See* 31 U.S.C. § 3729(a)(1)(A) (acts to which liability attach under the FCA include the knowing presentation of a false or fraudulent claim for payment or approval).

Although the Complaint does not allege how the Defendants are paid by the Navy, it does allege that the Defendants had a contract with the Navy for security services. The Complaint also alleges that the contract requires that ball ammunition and double retention holsters be provided. The contract itself constitutes a claim for payment, insofar as it recites the obligations of each party to one another. *See* 31 U.S.C. § 3729(b)(2)(a) (defining a "claim" in pertinent part as "any request or demand, whether under a contract or otherwise, for money or property . . . that is presented to an officer, employee, or agent of the United States.") The representation in the contract that ball ammunition and double retention holsters will be provided are false representations if the Defendants either intended to shortchange the government or recklessly disregarded the contract

requirements. Furthermore, there are ways of violating the FCA, which do not contemplate the submission of a falsified bill. For example, 31 U.S.C. § 3729(a)(1)(G) provides that an entity which "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government" commits an FCA violation irrespective of whether a claim is ever submitted to the government.

Manfield alleges that Symons, when confronted about the inadequacy of the ammunition, acknowledged that the frangible ammunition violated the Defendants' contract with the Navy. It is possible that Defendants made an honest mistake in providing the wrong ammunition and gear. It is also possible that the Defendants either intended to undercut the contract requirements or turned a blind eye[9] to them. The latter inferences are particularly plausible given the Defendants' alleged willingness to skirt gun shipment regulations. All reasonable inferences in a complaint are to be construed in favor of the plaintiff. *See Gargano,* 572 F.3d at 48. Accordingly, at the motion to dismiss stage, Manfield has alleged a sufficient factual predicate for his claim that he was engaged in protected conduct when he reported potential violations of the Navy contract to his employer.

---

[9] Under the FCA, the terms "know" and "knowingly" — (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud." 31 U.S.C. § 3729.

### B. Employer's Knowledge of Employee's Protected Conduct

FERA's change in the definition of what constitutes "protected conduct" for purposes of an FCA retaliation claim also changes the definition of what constitutes the employer's knowledge thereof. Pre-FERA the First Circuit stated:

> the employer must be on notice that the employee is engaged in conduct that 'reasonably could lead to a False Claims Act case.'. . . 'the kind of knowledge the defendant must have mirrors the kind of activity in which the plaintiff must be engaged.' . . . What the employer must know is that the plaintiff is engaged in protected conduct, that is, investigation or other activity concerning false or fraudulent claims that the employer knowingly presented to the federal government.

*Karvelas*, 360 F.3d at 238-39. Under the new statute, an employer's knowledge still mirrors the kind of activity in which the plaintiff must be engaged. Since a plaintiff now engages in protected conduct whenever he engages in an effort to stop an FCA violation, the act of internal reporting itself suffices as both the effort to stop the FCA violation and the notice to the employer that the employee is engaging in protected activity. Accordingly, Manfield has provided an adequate factual predicate for his claim that the Defendants knew that he was engaged in protected conduct.

### C. Discrimination Against the Employee Because of Protected Conduct

Manfield also alleges sufficient facts to support his claim that he was terminated because of his equipment-deficiency reports to the Defendants. The Complaint alleges multiple reasons why Manfield was fired: he refused to accept pre-MOU shipments of guns and ammunition, he told his officers to speak directly with HR about their failure to receive overtime pay, and he reported inadequacies

in the equipment provided by the Defendants. Although much of this activity is not protected under the FCA, this does not invalidate Manfield's FCA retaliation claim. The FCA does not require a plaintiff be terminated solely because he engaged in protected activity. Rather, the employer need only be "motivated, at least in part by the employee's engaging in protected activity." *Karvelas*, 360 F.3d at 239 (citing S. Rep. No. 99-345, at 35, reprinted in 1986 U.S.C.C.A.N. at 5300.) The question is thus whether the Complaint contains a sufficient factual predicate to support Manfield's claim that the Defendants' actions in terminating him were "motivated, at least in part," by his reports of inadequate equipment. *Id.*

Manfield alleges that the Defendants' stated reasons for firing him — that he was "defiant and uncooperative" — were pretextual. Symons related to Manfield that he was being fired because the Defendants felt that they could not trust him and cited as reasons for the lack of trust both Manfield's rejection of the pre-MOU shipments of guns and ammunition and Manfield's decision to refer his officers directly to HR with their payment difficulties. Although Manfield's equipment-deficiency reports were not among Symons' examples, an inference can be drawn that the Defendants were firing Manfield because they generally could not trust him to look the other way when they engaged in improper conduct.

In addition, the temporal proximity between Manfield's "tense" discussion with Bucher about frangible ammunition on July 9, 2009 and Manfield's firing on July 28, 2009 suggests that Manfield was fired, at least in part, because of his complaints about the frangible ammunition. *See Jewell v. Lincare, Inc.,* 2011 WL

4336710 at *4 (D. Me., Sept. 15, 2011)(allegations that firing occurred within weeks of protected conduct and allegations of pretext sufficient to meet causation element at motion to dismiss stage.) Less than three weeks passed between this conversation and Manfield's termination, and during one of those weeks, Manfield was on vacation.

Finally, after the July 9, 2009 conversation, Bucher left the frangible ammunition at the shipyard instead of taking it with him as he said he would. Construing all inferences in favor of Manfield, it is possible to infer that Bucher was displeased with Manfield for insisting that the frangible ammunition be removed from the shipyard and that he communicated that displeasure by tensing up in their conversation and making an insincere promise to Manfield to remove the frangible ammunition.

Because there is at least some factual support in the Complaint for a finding that the Defendants were motivated to fire Manfield, at least in part, by Manfield's reports of inadequate equipment, Manfield's FCA claim survives. The Court therefore denies the Defendants' motion to dismiss Count I of the Complaint.

## II. Count II: Fair Labor Standards Act Claims

The Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201-219 (the "**FLSA**") sets forth employment rules concerning minimum wages, maximum hours, and overtime pay. The FLSA contains an anti-retaliation provision under which it is unlawful:

> to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted

or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.

29 U.S.C. § 215(a)(3).

In *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S.Ct. 1325, 179 L. Ed. 2d 379 (2011), the Supreme Court interpreted what it means to "file[] any complaint" under this provision. Kasten, an employee at a plastics plant, complained orally that time clocks placed beyond the area where workers put on work-related protective gear, cheated workers out of pay for time spent either donning or doffing their gear. *Id.* at 1329. He claimed that he told his shift supervisor that the time clocks were illegally placed because "the time you come in and start doing stuff" was not being counted; he told a human resources employee that they would lose in court if challenged on this practice; and he told his lead operator that the location was illegal and that he was thinking about starting a lawsuit on the matter. *Id.* at 1330. Kasten's employment was terminated and he brought a retaliation claim under the FLSA. *Id.* This claim was foreclosed on summary judgment because Kasten had not filed a written complaint with his employer. *Id.* The Supreme Court reversed, holding that a complaint may be either oral or written. The Court cautioned, however, that:

> the statute [also] requires fair notice. Although the dictionary definitions, statutes, regulations, and judicial opinions we considered . . . do not distinguish between writings and oral statements, they do suggest that a "filing" is a serious occasion, rather than a triviality. As such, the phrase "filed any complaint" contemplates some degree of formality, certainly to the point where the recipient has been given fair notice that a grievance has been lodged and does, or should, reasonably understand the matter as part of its business concerns . . . a complaint

16

> is "filed" when "a reasonable, objective person would have understood the employee" to have "put the employer on notice that [the] employee is asserting statutory rights under the [Act]."

*Id.* at 1334-5. The Supreme Court left it to "the lower courts to decide whether Kasten will be able to satisfy the Act's notice requirement." *Id.* at 1336. *See also Claudio-Gotay v. Becton Dickinson Caribe, Ltd.*, 375 F.3d 99, 103 (1st Cir. 2004) (although employees are not required to file a formal complaint with a court or agency to receive FLSA protection, they are required "to take action beyond mere 'abstract grumblings'")(citing *Valerio v. Putnam Assoc., Inc.* 173 F.3d 35, 41 (1st Cir. 1999)).

### 1. Manfield's FLSA Claim

The allegations of the Complaint are not sufficient to sustain Manfield's FLSA retaliation claim. Manfield's two communications with the Defendants regarding discrepancies in the security officers' overtime pay lack the formality required to put the Defendants on notice that Manfield was asserting rights under the FLSA.

On the first occasion, Manfield "called Downs to speak about the discrepancies" in the security officers' timesheets and on the second occasion he only called Downs to get information on when the pay discrepancies would be corrected. Manfield does not allege that he voiced an opinion to the Defendants about the legality of their actions, much less that he was engaged in organizing or facilitating a labor action against the Defendants on his security officers' behalf. While there are occasions on which an employee will be protected from retaliation for protecting

another employee's rights under the FLSA, *see* 29 U.S.C. § 215(a)(3) (protecting employees who "cause to be instituted" any proceeding related to the FLSA), such an employee must still put his employer on notice of his actions and intentions. Manfield's limited and informal communications with the Defendants failed to inform them of any intent to institute an FLSA action. Accordingly, the Defendants' motion to dismiss Count II is granted with respect to Plaintiff Manfield.

### 2. Hendricks' FLSA Claim

On July 9, 2009, Hendricks spoke with Downs about the discrepancies in her paycheck. According to the Complaint, she told Downs that the deductions to her paycheck were illegal, and she cited the FLSA. She also protested that she didn't think payment by a supplemental check or by providing comp time was legal. The next day, Bucher told Manfield that Hendricks could not fill in for Manfield as site supervisor while Manfield was on vacation.

After Manfield's employment was terminated, Hendricks claims she expressed her interest in Manfield's position. Defendants did not consider Hendricks for the position and instead hired a straight male. Hendricks claims that she was not considered for or hired for the site supervisor position because of her sex, sexual orientation, and/or because she complained about illegal deductions from her paycheck.

Hendricks' citation to the FLSA to an individual within the HR department is enough of a factual predicate to establish that Hendricks gave Defendants notice of

her claim. The Complaint also sufficiently alleges a causal connection between Hendricks' conversation with Downs and the adverse employment action. The Complaint permits the inference that Downs reported her conversation with Hendricks to Bucher, thus leading Bucher to tell Manfield that he did not want Hendricks to stand in for Manfield during his vacation. The Complaint also permits an inference that Bucher was in a position of authority with respect to the hiring and firing of employees for the site supervisor position, and that he was disposed against Hendricks because of her conversation with Downs. Accordingly, the Defendants' motion to dismiss Count II is denied with respect to Plaintiff Hendricks.

## **CONCLUSION**

For the reasons stated, the Defendants' motion to dismiss Count I is DENIED, and the Defendants' motion to dismiss Count II is GRANTED as to Plaintiff Manfield but DENIED as to Plaintiff Hendricks.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 28th day of March, 2012.